In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-13-00404-CV**
_____

**IN THE INTEREST OF K.P., K.P., AND K.P.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 11-11-12742 CV**

**MEMORANDUM OPINION**

After a bench trial, the trial court entered an order which terminated the parental rights of N.C. (Mother) and A.P. (Father) to their daughters, K.P., K.P., and K.P.[1] *See* Tex. Fam. Code Ann. § 161.001 (West 2014).[2] In this appeal of the judgment terminating their parental rights, Mother raises three issues and Father raises seven issues.

---

[1]We identify the minor children by initials to protect their identities. *See* Tex. R. App. P. 9.8. Other members of the family are identified by either initials or based upon their relationship to the children.

[2]Because any subsequent amendments to the statutes cited in this opinion do not affect this case, we cite the current statutes.

1

In Mother's first issue, she asserts that the Texas Department of Family and Protective Services (the Department) lacked authority to remove the children prior to filing suit for termination. In her second and third issues, she challenges the legal and factual sufficiency of the evidence supporting (a) the statutory grounds on which the trial court terminated her parental rights, and (b) the trial court's finding that terminating her parental rights was in the best interest of the children.

In Father's first issue, he asserts the Department presented no evidence of the parent-child relationship between himself and the children, and therefore the trial court erred in terminating his "parent-child relationship," because there was no relationship to terminate. Second, he maintains there was no evidence, or insufficient evidence, to remove the children, and he was not provided an attorney at the adversary hearing. In his third through seventh issues, he argues the legal and factual insufficiency of the evidence supporting (a) the statutory grounds on which the trial court terminated his parental rights, and (b) the trial court's best-interest finding.

UNDERLYING FACTS

Mother and Father were never married but lived together for several years. They have three young daughters, K.P., K.P., and K.P. Born in October 2008, the first two children are twins. The third child was born in January 2010. In May

2011, the Department received a referral report of neglectful supervision of the three children. The report stemmed from Mother's alleged "mental health instability" following her attempted suicide. Over the course of the next several months, the Department conducted numerous visits, established a Family Based Safety Services plan (Family Plan) for the parents, and made efforts to work with Mother and Father to help them care for the children. The Department made the determination that it needed to remove the children from the parents.

INITIAL REMOVAL OF CHILDREN
AND PETITION FOR CONSERVATORSHIP AND TERMINATION

In August 2011, when the Department indicated it was going to remove the children, Mother agreed to have the children voluntarily placed with a maternal relative. After the relative cared for the children briefly, the relative decided she could no longer provide care for the children, and they were placed with another maternal relative, E.H. (the Aunt). Thereafter, the Aunt also informed the Department she could no longer care for the children. Accordingly, the Department removed the children from the Aunt's residence in November 2011, and filed a petition for a protective order. The Department also filed a petition seeking conservatorship of the children and termination of Mother's and Father's parental rights. The petition was supported by an affidavit that described the circumstances necessitating removal.

The affidavit, made by Department representative Toni Gbawar, stated that the initial referral to the Department on May 5, 2011, referred to the prior report of neglectful supervision of the children. Gbawar alleged in the affidavit that during Department visits to the home in June 2011, it was observed that Mother, who was inside the home with the children, left the twins unattended. In July 2011, the Department received another intake report of neglectful supervision by Mother and Father. Based on subsequent visits to the home, Department employees had concerns that the children were at times unattended, their diapers were not changed often enough, and they were subjected to potential hazards in the home. Gbawar's affidavit included information regarding the Department's concerns and its efforts to work with the parents. Gbawar's affidavit also referenced a letter dated September 28, 2011, from pediatrician Rachel McConnell, who examined the children when they were living with the Aunt. Relying on Dr. McConnell's evaluation, the Department's affidavit stated as follows:

> Per Dr. McConnell, the girls were diagnosed as failure to thrive on their weight and height percentages. Neither of the three children possessed good walking, climbing or speaking capabilities. The Doctor shared that at the children's ages that their developmental abilities were not normal. The Doctor went on to state neither of the children had ever visited a dentist and the twins had elongated palates, which is an indication of excessive pacifier use. During removal of their diapers, both twin girls would scream until their diapers were replaced and

4

> [one of the girls] has hymen notching which is indicative of sexual abuse. Both twins had multiple healed lesions on their buttocks that appeared to be from abscesses and none of the children were up to date on vaccinations. Dr. Rachel McConnell summarized the progress notes by stating it is in her professional opinion that the children's living environment was harmful to them mentally, physically and emotionally and under no circumstances should the children be reunified with their biological parents.

According to the Department's affidavit, McConnell concluded that the children suffered from developmental delays due to "medical neglect" by Mother and Father. The affidavit further stated that Mother and Father had a prior history with the Department from November 2010, when the children were exposed to domestic violence in the home, and Father was reported to be a drug abuser. On November 30, 2011, the trial court signed the protective order naming the Department as the children's temporary sole managing conservator. A bench trial regarding termination of Mother's and Father's parental rights was held in 2013.

TESTIMONY OF FAMILY PLAN SUPERVISOR

At the termination trial, Chelsea Clay, the Family Plan supervisor for the Department, testified about the underlying report and basis for the Department's intervention. At the time of the May 2011 referral, the oldest two children (twins) were approximately three years old and the youngest child was one-and-a-half years old. Ms. Clay only personally visited the home on one occasion. Toni

5

Gbawar was the Department caseworker initially assigned to the case, and Ms. Gbawar conducted several visits and made an initial assessment.

The Department identified several concerns during Ms. Gbawar's visits, and the Department set up a Family Plan for Mother and Father in June 2011. Clay testified that the plan included parenting education and random drug screens for Mother and Father, and required Mother to attend counseling and see a psychiatrist. Additionally, the Family Plan required another adult to be present in the home with Mother and Father at all times. Ms. Clay testified the Department visited the home again on June 16, June 28, July 20, and July 21. She explained that the Department worker reported the twins "were always in the crib unsupervised" at both scheduled and unscheduled visits; their cribs were downstairs, and the door to their room was shut. On August 15, 2011, the Department received a second intake for neglectful supervision by Mother and Father. Ms. Clay accompanied Ms. Gbawar on a home visit the following day to determine if there "was a pattern of neglect going on." As Clay was walking up to the home, she observed the twins standing in their cribs and moving the draperies at the window. The reports that the children were constantly being left in their cribs concerned Clay. She testified that it took Mother approximately four minutes to answer the door. When Clay entered the home, she observed, as had been

6

previously reported, that the twins were unsupervised in their crib. Ms. Clay asked Mother why the children were always left in a crib in a room with a closed door, but Mother did not provide a satisfactory response. Ms. Clay testified that the room for the twins was like a "closet," and the home was "in disarray where no children [could] even play outside of the crib due to feces [o]n the floor." Prescription pill bottles were "out on the tables." Ms. Clay instructed Mother to clear a space on the floor so the children could crawl and play, and also to obtain a safety gate for the stairs and a working baby monitor. In violation of the Family Plan, no other adult was at home with Mother at the time of the Department's visit. Clay did not leave the home until another adult arrived to monitor Mother.

TESTIMONY OF CASEWORKER ASSIGNED AFTER REMOVAL

Kendra Murphy, another Department caseworker for the children, testified that she had been assigned to the case since the children's removal. She explained that while the children were placed with the Aunt, the Aunt took them to the doctor because they needed vaccinations and had boils or abscesses from staph infections. And, one of the children had a urinary tract infection. The Aunt tried to care for the children but later informed the Department she could no longer care for them because of her financial hardship and the children's overwhelming needs. The children were then placed into a foster home, which was the same foster home in

7

which they were living at the time of trial. No immediate relative of the children was willing or able to care for the children at the time of trial.

The last time Ms. Murphy spoke with Father was in March 2013, when he called and asked to visit the children. The visit was set up but Father failed to appear because of a miscommunication. In the past, Murphy had asked Father about his willingness or ability to provide a safe and stable home for the children. Father told her that, although he wanted to take care of the children, he was not capable of doing so. The Department later learned that he had moved from Texas, and Murphy did not have Father's new contact information. Murphy also testified that she prepared a service plan for Father that would have enabled him to have his children returned to him. According to Murphy, Father was noncompliant with his service plan. She stated that he failed to submit to a psychological evaluation, provided no proof that he completed parenting classes, and failed to participate in nutrition classes. He also attended only a few sessions of individual counseling and did not complete his counseling. Murphy explained at trial that she had worked with the family for over eighteen months, and she would have concerns if the children were returned to Father.

Murphy also testified that the Department prepared a service plan for Mother which would have enabled her to have her children returned to her. As part of her

service plan, Mother was asked to undergo psychological evaluation, attend parenting and nutrition classes, and maintain a stable home. Although Mother attended some therapy sessions and parenting classes, she failed to have the psychological evaluation and failed to provide proof of completion of nutrition and parenting classes. Additionally, according to Ms. Murphy, for about three weeks in March 2013, Mother was incarcerated and missed scheduled visitation with her children. The Department caseworker visited Mother in jail, and Mother refused to disclose to the Department caseworker the circumstances that led to the incarceration. According to Ms. Murphy, during the months that the Department had the case, Mother showed continued instability. She lived in approximately four or five different places. Furthermore, at some point during the underlying proceeding, the trial setting had to be continued because Mother was again hospitalized at a psychiatric hospital for another attempted suicide.

Ms. Murphy testified she believes it is in the best interest of the children for Father's and Mother's parental rights to be terminated, and she asked that the Department be named permanent managing conservator of the children. Murphy explained that the goal for all three children would be to achieve an unrelated adoption and that the Department would try to keep the children together.

On cross examination, Ms. Murphy conceded that Father is no longer in the picture and Mother has gotten her medications altered. Murphy also agreed that at the time of trial, the children had gained about four pounds but she noted that medical and developmental concerns still existed.

TESTIMONY OF THE AUNT

The Aunt testified that the children were placed with her from September 2011 to early December 2011. According to the Aunt, she and her husband were surprised by the children's condition when the children were first placed in their home. The Aunt had been around the children a few times before, but did not know "the extreme of the behaviors and the setbacks, if you will, that we were going to be facing." The children had staph infections, and one of the children was experiencing "night terrors" every night. The Aunt took the children several times to Dr. McConnell. The children, especially the twins, had trouble walking. They would run into walls and fall out of chairs. The twins' hands would shake at every meal, and the twins would get very anxious and shovel food into their mouths. They had difficulty chewing.

The Aunt observed the children stripping down completely and touching their genitals daily, and the children exhibited severe anxiety during diaper changes. As a result of her observations, the Aunt contacted the Department. The

Aunt also spoke to Mother about what she observed, and Mother told the Aunt that one of the children may have been sexually abused while the child was visiting the home of the children's paternal grandparents. The Aunt testified that she did not believe Mother or Father sexually abused the children.

The Aunt supervised visits between the children and Mother and Father, and the Aunt described the interaction as "loving." Mother would call and check on the children and talk to them, but according to the Aunt, Mother could have done more. Although the Aunt noticed some progress while the children were in her care, she ultimately could not continue to care for them because of financial reasons and the difficulty of caring for them. The Aunt testified that she believed that Mother and Father neglected all three children. Furthermore, in the Aunt's opinion, she believed that adoption would be in the children's best interest.

TESTIMONY OF CASA VOLUNTEER

The CASA volunteer, D.G., also testified at trial. D.G. did not meet the children until January 2012. According to D.G., she attended sixteen visits with the children. Of the sixteen visits, Mother attended between eleven to thirteen of the visits and Father attended five. D.G. testified that Mother and Father appeared to love the children and played well with them. Although D.G. characterized the visits as "fun, happy play[,]" she explained that there was no difference in how the

children acted with their parents and other people. D.G. did not believe there was "a parent-child bond" between the children and Mother or Father. According to D.G., the children did not get upset when the visits were over and they had to say goodbye to their parents.

D.G. testified that although Father had expressed a willingness to care for the children, it is her belief that Father does not have the financial ability to raise the children, does not have transportation to get the children to medical treatment, and has left the children in dangerous situations by leaving them with Mother when he knew Mother was mentally unstable. D.G. explained that during the case she was informed that Father lives in Indiana. D.G. had not spoken to Father during the six or seven months leading up to the trial. D.G. believes Mother is unable to take her medications properly, and unable to take care of herself or the children. Mother admitted at one of the family conferences attended by D.G. that Mother had used rags to tie pacifiers in the twins' mouths.

In D.G.'s opinion, the children had progressed since the Department took temporary custody of them: they had gained weight, attended speech and occupational therapy, and attended doctor's appointments. D.G. testified that the children needed a stable and nurturing environment and parents who could understand their disabilities and medical needs. She recommended that the trial

court terminate Mother's and Father's parental rights, and it was her opinion that termination would be in the children's best interest.

TESTIMONY OF COURT-ORDERED COUNSELOR

Victor Love, a licensed counselor, testified that, as part of the court-ordered family plan of service, he had therapeutic sessions individually with Mother and Father. Father and Mother described their roles similarly--Father was the "primary bread winner" in the family and Mother stayed at home. Mother's and Father's relationship with one another ended while the children were in foster care. Mother told Love that when Father and Mother were together that Father was emotionally and verbally abusive to her in front of the children.

Love met with Mother for six-and-one-half sessions from June 4, 2012, to October 1, 2012. They discussed the reasons for the Department's involvement: concerns regarding the children's improper nutrition, slow development, and poor housing conditions. Mother blamed the children's problem behavior on their perception of the tension between Mother and Father. According to Love, although Mother took some responsibility and told him that "she could have fed the children differently," Mother did not agree with the Department's allegation that the children were malnourished. Mother reported to the counselor, however, that when the children ate, "it seemed like they were starving."

Mother also told Love that Father had "pushed her toward" suicide and told her that she deserved to die. Mother indicated to Love that in 2011, when she attempted suicide the second time, Father refused to assist her in getting medical attention. She told Love that she had been diagnosed with depression, obsessive compulsive disorder, and ADHD or ADD, and that she had been taking Cymbalta, Zoloft, Adderall, Klonopin, Ambien, and Tramadol for about the last year. Mother also admitted to Love that she had abused prescription medicine in the past, that the second suicide attempt was by overdose, and that at the time of the sessions, she was not seeing a psychiatrist. Love believed that Mother was concerned that her mental instability had endangered the children.

Love discharged Mother from his services after Mother left the seventh session early and failed to contact him to schedule another session. He testified that Mother made no progress with him and that he would have concerns if the children were returned to her care. Love stated that in his opinion it would be in the best interest of the children for Mother's parental rights to be terminated because of the evidence of personality disorders that had led her to abandon the children or to attempt suicide, and because of her maintaining a relationship with an abusive person.

Father met with Love on June 4, 2012. Father admitted that he and Mother did not feed the children as well as they could have, and Father blamed their "failings" on Mother's inexperience with children. At a second session on June 18, 2012, Father indicated that he was aware that a pediatrician had diagnosed the children with failure to thrive. Father disagreed. He told Love that the children had been to a pediatrician many times, and Father claimed he had never been informed that there were any problems with the children. During the sessions with Love, Father mentioned that Mother had attempted suicide in 2005 and 2011, but Father did not otherwise provide much detail about Mother's mental health. The third session Father attended was on July 9, 2012, and after that date he failed to appear for any more sessions.

The counselor discharged Father from counselling services after Father did not attend any more sessions or make any therapeutic progress related to the Department's concerns. According to Love, it would not be in the children's best interest to return to Father's care because, based on Mother's reports, the children witnessed Father's engaging in "dynamics that are similar to people who batter their spouses" and Father never took responsibility for those actions. Love described Father as having a "victim mentality," and explained that Father was not trying to better his own, the Mother's, or the children's lives. Love testified that,

because Father had knowledge of Mother's suicide attempts and the poor living conditions, he endangered the children by leaving them with Mother.

From approximately June 2012 through December 2012, Love observed Mother and Father interact with the children at the Department's office during various visits. Love described Mother's behavior during the visits as "anxious" and "ineffectual[.]" He noted that the twins appeared to be the same size as the youngest child. Love admitted that the last time he saw the children, which was one or two weeks prior to the May 2013 trial, their appearance had not substantially changed. He agreed that he had concerns as to whether the medications Mother was taking were appropriate, but he acknowledged that no pharmacist had reviewed her medications, as done in some other Department cases.

TESTIMONY OF FOSTER PARENT

B.H., the children's foster parent, also testified. The children were placed with B.H. on December 1, 2011. She explained that at the time of the trial the children had been in her care for a year-and-a-half, with the exception of one week in March 2013 when they were placed with their maternal grandmother.

B.H., who had been a foster parent for twenty-two years and had four children of her own, described Mother's and Father's children as "very energetic, very high maintenance" with "no realization of safety issues," and "more difficult

16

to handle than . . . three normal children their age." She described the twins as "developmentally delayed" and "probably never going to be able to take care of themselves fully," but she described the youngest of the three children as now being developmentally on target. B.H. testified she takes the children for visits to the pediatrician and to speech and occupational therapy, and she explained that the children have improved developmentally while in her care. At the time of trial, one of the twins weighed twenty-seven pounds, the other twin weighed twenty-eight pounds, and the youngest child weighed twenty-nine pounds. B.H. stated that blood tests were run to make sure the "thyroid and their endocrinology stuff was all functioning right" and "their blood work came back okay."

TESTIMONY OF DR. MCCONNELL

Dr. Rachel McConnell, a medical doctor, testified at trial. She stated that she probably examined the children "several times" prior to writing her September 28, 2011 letter. Mother only attended one "well visit" in May 2011 and prior to the children's removal, and Mother only brought the youngest child to McConnell's office. McConnell testified that she did not report anything to the Department after the May 2011 visit with the youngest child because the history she received from Mother did not indicate neglect or abuse, and "unfortunately my neglect headlights didn't pop up[.]" McConnell discussed the youngest child's nutrition with Mother

17

and asked Mother to bring the child back for a "follow-up" about a month later, but Mother did not bring the youngest child back. McConnell did not see the children again until the Aunt brought all three children to see her later in September 2011. McConnell knew the Department was involved with the children and was informed that there was a possibility the children would be returned to their parents.

McConnell was concerned when she examined all of the children because they were "very small[,]" their development was "very behind[,]" and they had difficulty walking for their age. Based on the fact that the children's height and weight fell below the two-and-one-half percentile on the World Health Organization curve, McConnell diagnosed them with "failure to thrive." McConnell testified that in her opinion the children's problems had developed over a period of time. Although she admitted other issues such as organ, chromosome, or thyroid problems could cause failure to thrive, she "went with the most probable cause. . . . they probably just weren't getting fed[.]"

McConnell was informed that the children were "born normal," and that at least one of the children's relatives was under the impression that the parents were not feeding the children. McConnell explained that each twin had an elongated palate, a condition which forces teeth out and occurs most often from continued use of a pacifier. McConnell testified that the Aunt also informed her that she

18

believed pacifiers were tied in the children's mouths by the children's Mother so that the children could not spit out the pacifiers. In McConnell's professional opinion, tying a pacifier to secure it in a child's mouth not only constitutes neglect, but also constitutes cruelty and creates a strangulation hazard which could be deadly. In her opinion, the children's failure to thrive combined with "everything else pointed or indicated that these girls were neglected." She further testified she was concerned because one of the twins had a hymenal notch, which sometimes is consistent with sexual abuse. In McConnell's opinion, some sort of penetration "probably" caused the notch.

Based on the physical exams and developmental assessments McConnell performed on the children, she believed in September 2011 that the children had been emotionally and physically endangered and harmed in their home environment with Mother and Father. McConnell reaffirmed at trial her statement from her prior letter that "[i]t is in [her] professional opinion that the environment the children came from was harmful to them mentally, emotionally and physically. Under no circumstances should they be placed back with their biological parents who are either unwilling or unable to properly care for any of them." After the September 2011 appointment with the children, McConnell talked with the Department caseworker, but McConnell did not make a report because she knew

the Department was already involved. McConnell provided no additional medical care to the children after they were placed in foster care.

TESTIMONY OF MOTHER

Mother's first suicide attempt occurred when she was twenty-two years old and she overdosed on prescription medication. Her second attempt was in 2011, when she overdosed on thirty Benadryl pills after she had an argument with Father and "just didn't see any reason for living." The children were home asleep at the time. After she overdosed, she asked Father to take her to the hospital and he initially refused. Later, Mother convinced Father to take her to the hospital, and a doctor recommended that she seek therapy. Mother was hospitalized for about four days at Kingwood Pines Hospital. While she was in Kingwood Pines receiving treatment, counseling, and medication, she learned of the Department's involvement from Father. Mother assumed that the subsequent visits to the home by the Department were in response to her hospitalization after her suicide attempt. She testified that she did not believe her actions in attempting suicide placed her children in danger because Father could care for the children regardless of whether the suicide attempt was successful or unsuccessful.

Mother testified that the twins each weighed 3.1 pounds at birth and stayed at the hospital for two weeks after their birth. Her youngest child was not born

20

prematurely. Mother stated that a pediatrician, Dr. Suell, treated all three children. She testified that she did not neglect the children or deprive them of food. Mother said no one ever told her the children were too small or that she needed to feed them more.

According to Mother, it was a coincidence that every time a Department worker visited Mother's home, her children were in a crib. Mother claimed that the Department worker always came to the house when the children were just waking up or going down for a nap. Mother testified that she let the kids play outside daily, and would keep the children in a secure area if she was cleaning, taking a shower, or making them lunch. Mother explained that the Department workers who visited the home never expressed concerns that she was not properly taking care of the children and never asked her to change anything regarding her house or how she cared for the children. Mother testified that the Department workers would check her pantry to see if she had appropriate food for the children. The only thing Mother remembered that the Department worker had a concern about was that the batteries in the baby monitor were dead every time the worker stopped by, but Mother was not concerned because she considered herself "a light sleeper."

Mother admitted that the house where they were living in May 2011 was "a little crowded" for her family and the two guests who lived with them, but she

claimed she kept the home clean. According to Mother, they were living in poverty but that Father was able to support the children during the times he was employed. In Mother's opinion, the house presented no danger to the children. Furthermore, in Mother's opinion, her children had never been placed in danger while in her care. Mother admitted that, prior to the birth of the youngest daughter, the twins witnessed Mother and Father having physical altercations. At trial, Mother testified she did not believe any of her children had been sexually abused. Mother claims she was not aware of the sexual abuse allegations until she was hospitalized in 2011. However, Mother testified that after she witnessed one of the twin's reactions to having her diaper changed, Mother asked Father if he thought the child had been sexually abused.

According to Mother, she completed her parenting classes. Although she acknowledged she was "unsuccessfully discharged" from Love's counseling sessions, she thought she finished the "first run of sessions [and] that it was going to be at least a month or two before I could continue on." She testified that she did not recall whether Love's office ever contacted her after her last session, and she claimed that no one from the Department informed her that she needed to go back for additional sessions. She stated she did not learn anything from attending the counseling. She testified she has had visits with the children once every two weeks

during their time in foster care, and she believes she has developed a bond with them. She admitted she did not complete the nutrition classes but indicated it was because she could not afford them. She also admitted she had not completed her psychological assessment, but she claimed she did try to re-schedule an appointment for it but she "never got another call after that."

Mother conceded that, during the pendency of the case, she pleaded guilty to, and was convicted of, theft for stealing merchandise totaling almost eight hundred dollars from a store. As a result, she served twenty-two days in jail in March 2013, less than six months before trial. Mother partly blamed the medication she was on for the theft. She testified she was living with a registered sex-offender in April 2013, and he called 9-1-1 to report she was suicidal. Mother admitted that she had a "meltdown" and "snapped" because of the stress with the Department case and Father's lack of parenting, and that she went to Cypress Creek Hospital for nine or ten days. She testified that she recently learned from her psychiatrist that the medications prescribed while she was hospitalized were a "dangerous combination" and "could have been partly also why [she] snapped."

Mother testified that she was diagnosed with bipolar disorder at age fourteen, and she currently takes "Zyprexa, Zoloft, BuSpar, and one other one," as prescribed by her psychiatrist. She feels her new medications have made a

"complete difference" and she now feels calmer and "a little bit more sane." Mother explained that her current psychiatrist has also diagnosed Mother with borderline personality disorder as a result of her "abandonment issues" because Father left her.

At the time of trial, Mother was living with a friend and had lived in three different places since May of 2011. She conceded at trial that her housing was unstable, but stated that her goal was to become independent again. She testified that her plan was to go "to a women's shelter" the following week and get help with finding stable housing through government assistance. She also planned on applying for disability, although she had been denied disability on her prior application.

TESTIMONY OF DR. SUELL

Dr. Douglas Suell, M.D., was called as a witness for Mother and Father. Dr. Suell testified that he last examined the youngest child and one of the twins on February 17, 2010, and he last examined the other twin on December 17, 2009. Suell explained that while he was treating them, the twins "followed an expected growth curve, which included weight and height and head size." According to Suell, the twins were premature, and because their gestational age at birth was thirty-four weeks, they were "petite . . . throughout the time that [he] saw them."

24

He stated he never had concerns that the children were undernourished or that Mother was not caring properly for the children. Dr. Suell could not remember if he had ever met the Father, but Suell stated he had no information indicating that Father was not properly feeding or caring for the children. Dr. Suell explained that in order for the doctor who saw the children in late 2011 to make a "failure to thrive" diagnosis, it would be important for that doctor to have Dr. Suell's growth charts for the children because it would be difficult to make a diagnosis "without more data." He believes that a pediatrician seeing a two or three year old child for the first time who is below the 5th percentile should ask for the previous physician's record in order to get more data to "extrapolate the curve." According to Dr. Suell's notes, Dr. McConnell never requested a copy of Suell's medical records for the children.

Suell conceded that although the youngest of the three children was average birth weight and was a healthy weight at nineteen days old, it could be "possible" that a doctor seeing the child a year-and-a-half later could diagnose the child with "failure to thrive." With respect to the twins, Dr. Suell acknowledged that from the time he last saw them to August or September 2011, it would be possible for a doctor to diagnose them with "failure to thrive." In Suell's opinion, he would expect a child who had been previously diagnosed with "failure to thrive," but then

25

who had been provided adequate nutrition, to experience improved weight. He also testified that it is possible to have a diagnosis of "failure to thrive" without the parents' having neglected the child.

## FINAL ORDER OF TERMINATION

After the bench trial, the trial court signed a final order of termination on August 20, 2013, named the Department as permanent managing conservator of the children, and terminated Mother's and Father's parental rights to all three children. In addition to finding that termination was in the children's best interest, the trial court found that Mother and Father (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being; and (3) failed to comply with the provisions of the court order. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2). The trial court also found that Father had constructively abandoned the children under section 161.001(1)(N) of the Texas Family Code. *See id.* § 161.001(1)(N).

STANDARD OF REVIEW IN PARENT-CHILD TERMINATION CASES

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish at least one ground listed under subdivision (1) of the statute, and must also prove that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001; *In the Interest of J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Due process requires the petitioner to justify termination by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (West 2014); *In the Interest of J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing evidence" is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014).

In reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a "firm belief or conviction that its finding was true." *In the Interest of J.F.C.*, 96 S.W.3d at 266. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume

that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

In a factual sufficiency review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In the Interest of J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (footnote omitted).

PARENT-CHILD RELATIONSHIP OF FATHER

Father argues in his first issue that the State did not present any evidence that he had a parent-child relationship under section 160.201(b) of the Texas Family Code. *See* Tex. Fam. Code Ann. § 160.201(b) (West 2014). Father does not claim that he is not the father of the children, but only that there "is no evidence establishing his paternity." Father never raised this argument in the trial court. We conclude the argument is without merit.

The temporary order following the adversary hearing refers to Father as "Respondent Presumed Father[,]" and notes that Father "appeared in person and

28

announced ready." Father signed the order, which requires him to pay child support, as a "Presumed Father" of the children. He filed an "Affidavit In Support of Court Appointed Attorney" and requested appointed counsel. He also signed the Status Hearing Order as "Presumed Father" of the children, and he signed admonishments which include an acknowledgment that failure to comply with the Family Service Plan could result in the termination of his parental rights. Father and Mother together filed a motion requesting "increased visitation with their children." Father and Mother filed a "Motion for Judgment" wherein they refer to themselves as the children's "parents" and ask the court to "grant a judgment against termination of their respective parental rights[.]" In September 2012, Father filed a counter-petition stating that Father is "Counterclaimant, and father of [K.P., K.P., and K.P.]" and requesting, in the alternative, that he be named as "a parent possessory conservator" of the children.

At trial, Father never challenged his paternity of the children. His counsel argued at trial that Father's parental rights should not be terminated on the grounds asserted and that termination of Father's parental rights would not be in the children's best interest. The order of termination refers to Father as "respondent father," and it is signed by Father's counsel. Through his pleadings and counterclaim, Father admitted that he has a parent-child relationship with the

29

children, and he admitted his paternity as to all three children. *See generally In the Interest of G.A.G.*, No. 04-07-00243-CV, 2007 Tex. App. LEXIS 8960, at \*\*2-7 (Tex. App.—San Antonio Nov. 14, 2007, no pet.) (mem. op.) (Answer, which stated the respondent was the father, and which was signed by attorney, was an admission of paternity.); *In the Interest of K.W.*, 138 S.W.3d 420, 429-30 (Tex. App.—Fort Worth 2004, pet. denied) (Letters sent by alleged father to Department and court stating he is the father and did not want to relinquish his rights was sufficient as an admission under section 161.002(b).); *Estes v. Dallas Cnty. Child Welfare Unit*, 773 S.W.2d 800, 801-02 (Tex. App.—Dallas 1989, writ denied) (Answer filed by the presumed father was sufficient to constitute an admission of paternity.).

In hearings before the trial court, in the pleadings filed with the court, and at trial, Father represented himself to be a parent and the father of all three children. Father's pleadings further constitute a judicial admission. *See Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001); *see also Johnson v. Johnson*, 579 S.W.2d 30, 31 (Tex. Civ. App.—Beaumont 1979, no writ) (Facts admitted in a pleading are considered judicial admissions, and respondent's admission that both children "were born to or adopted by the parties to the marriage" was a judicial admission that he was the father and he was bound by this

30

admission.). We conclude there was sufficient evidence before the trial court for the court to find that Father has a parent-child relationship with all three children. We overrule Father's first issue.

SUFFICIENCY OF THE EVIDENCE TO SUPPORT REMOVAL

Mother's first issue and Father's second issue challenge the sufficiency of the evidence supporting the children's removal.[3] Mother argues that because the State failed to establish that an emergency existed or that there was a danger to the children's physical or emotional well-being, the State did not have authority to remove the children without a court order and "failed to meet its burden of proof at the adversary hearing." Similarly, Father contends there was no evidence or

---

[3]To the extent Father argues he was denied due process because he was not appointed an attorney at the adversary hearing, he failed to raise the issue at trial and has failed to preserve it for appeal. *See* Tex. R. App. P. 33.1. Even assuming Father preserved the error, section 107.013(a)(1), which requires the appointment of an attorney to represent an indigent parent if the parent responds in opposition to the Department's termination petition, contains no timetable for appointing the attorney to represent the parent. *See* Tex. Fam. Code Ann. § 107.013(a)(1) (West 2014); *In the Interest of J.M.C.*, 109 S.W.3d 591, 597-98 (Tex. App.—Fort Worth 2003, no pet.). The timing of appointment of counsel to indigent parents appearing in opposition to termination is a matter within the trial court's discretion. *In the Interest of M.J.M.L.*, 31 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied). Father filed his "Affidavit in Support of Court Appointed Attorney" on December 12, 2011, the same date as the adversary hearing. The trial court appointed counsel for Father on January 25, 2012, the date of the next status hearing, and over fifteen months prior to the final trial. We conclude on this record that Father was not denied due process, and the trial court did not abuse its discretion by not appointing counsel earlier in the proceedings.

31

insufficient evidence to remove the children and that "[s]ince the State failed to meet its burden of proof in the removal of the children, the court had no subject matter jurisdiction regarding the issues in trial."

On November 30, 2011, the trial court entered a temporary order authorizing the emergency removal of the children. In August 2013, the trial court entered a final order terminating Father's and Mother's parental rights as to all three children. Father's and Mother's complaints regarding the temporary order are moot. *L.F. v. Dep't of Family & Protective Servs.*, Nos. 01-10-01148-CV, 01-10-01149-CV, 2012 Tex. App. LEXIS 3481, at *38 (Tex. App.—Houston [1st Dist.] May 3, 2012, pet. denied) (mem. op.) (citing *Wright v. Wentzel*, 749 S.W.2d 228, 234 (Tex. App.—Houston [1st Dist.] 1988, no writ) (declining to address issues related to temporary orders because trial court had entered final order)). Accordingly, we overrule Mother's first issue and Father's second issue.

STATUTORY GROUNDS FOR TERMINATION

In Mother's second issue, and Father's fourth and fifth issues, Mother and Father challenge the sufficiency of the evidence supporting termination under section 161.001(1)(D) and 161.001(1)(E). S*ee* Tex. Fam. Code Ann. § 161.001(1)(D), (E). Endangerment means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.

32

1987). Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.*; *see In the Interest of P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.). Subsection (D) requires the endangerment to the child to be the direct result of the child's environment. *In the Interest of R.D.*, 955 S.W.2d 364, 367-68 (Tex. App.—San Antonio 1997, pet. denied). Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In the Interest of J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Because the evidence pertaining to subsections (D) and (E) is interrelated, we conduct a consolidated review. *In the Interest of T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *In the Interest of J.T.G.*, 121 S.W.3d at 126; *see also In the Matter of B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied).

The trial court heard evidence from Dr. McConnell that, in her opinion, the children suffered from failure to thrive and from developmental delays because of the mental, emotional, physical, and environmental harm caused by Mother and Father. The court also heard evidence that McConnell noted possible indications of

sexual abuse of one of the children. The trial court could have found McConnell's testimony more credible than Dr. Suell's.

The affidavit for removal set out Father's and Mother's prior Department history, which included their inability in 2010 to "provide stable home environment" for the children and which also noted that the children had been exposed to domestic violence in the home. Mother admitted that the children had witnessed physical altercations between her and Father, and that Father was emotionally and verbally abusive to her in front of the children. Domestic violence can be considered evidence of endangerment to children. *In the Interest of C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied); *see also In the Interest of B.J.B.*, 546 S.W.2d 674, 675-77 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.).

Mother testified that the Department became involved after her second suicide attempt, when she overdosed because she "just didn't see any reason for living." Although Mother claimed the children were asleep during the suicide attempt, Mother's attempted suicide is conduct that endangered the physical and emotional well-being of the children. A parent's mental instability and attempt to commit suicide may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *See In the*

34

*Interest of J.T.G.*, 121 S.W.3d at 126; *In the Interest of A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999 no pet.); *In the Interest of C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ); *see also In the Interest of E.A.W.S.*, No. 02-06-00031-CV, 2006 Tex. App. LEXIS 10515, at **36-43 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied).

The record establishes that Father was aware of Mother's suicide attempts and mental instability, but that he continued to leave the children in her care. This type of conduct demonstrates evidence of endangerment under section 161.001(E). *See* Tex. Fam. Code Ann. § 161.001(1)(E); *In the Interest of S.I.H.*, No. 02-11-00489-CV, 2012 Tex. App. LEXIS 2081, at *14 (Tex. App.—Fort Worth Mar. 15, 2012) (no pet.) (mem. op.); *In the Interest of D.R.J.*, No. 07-08-0410-CV, 2009 Tex. App. LEXIS 5231, at **20-21 (Tex. App.—Amarillo July 8, 2009, pet. denied).

Considering the evidence of the unstable environment, the children's medical condition, domestic abuse in the household, Mother's suicidal tendencies, and Father's leaving the children with Mother when he was aware of her mental instability, the trial court could reasonably have formed a firm belief or conviction that Father and Mother engaged in conduct and knowingly placed or knowingly allowed the children to remain in conditions that endangered their physical or

emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *In the Interest of J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *In the Interest of C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

We hold that the evidence is legally and factually sufficient to support the trial court's decision to terminate Mother's and Father's parental rights under subsections (D) and (E). We overrule Mother's second issue[4] and Father's fourth and fifth issues. As only one predicate finding under section 161.001(1) is necessary to support a termination order, we need not address Father's third and sixth issues challenging other statutory grounds found by the trial court. *See In the Interest of A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

BEST INTEREST

Mother's third issue and Father's seventh issue challenge the sufficiency of the evidence supporting the finding that termination of their respective parental rights is in the children's best interest. The Texas Supreme Court has recognized a non-exhaustive list of factors that are pertinent to the inquiry of whether termination of parental rights is in the best interest of the child: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future,

---

[4]To the extent Mother raises a challenge under section 161.001(1)(O), we need not address her challenge as only one predicate finding under section 161.001(1) is necessary to support a termination order. *See In the Interest of A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

(3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307 (West 2014). No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. *In the Interest of A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). In examining the best interest of the child, we may consider evidence that was also probative of the predicate act or omission. *See In the Interest of C.H.*, 89 S.W.3d at 28. The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. *In the Interest of N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

As to whether termination of Mother's parental rights is in the children's best interest, the trial judge could have considered that Mother endangered the children by exposing them to domestic violence and to her mental instability. *See*

*In the Interest of A.M.*, 385 S.W.3d 74, 82-84 (Tex. App.—Waco 2012, pet. denied) (concluding that evidence of mother's history of neglecting and endangering children by exposing them to domestic violence supported trial court's finding that termination was in the child's best interest); *C.G.V. v. Tex. Dep't of Human Res.*, 663 S.W.2d 871, 874 (Tex. App.—Beaumont 1983, no writ) (considering evidence of mother's mental instability in determining there was sufficient evidence to support finding that termination was in child's best interest). The trial court also heard evidence of Mother's own admission that she tied pacifiers in the twins' mouths, an act that, according to Dr. McConnell, is dangerous and potentially deadly.

After the children's removal, Mother was hospitalized in a psychiatric hospital, was convicted of theft, and was incarcerated for twenty-two days. She has continued to demonstrate an inability to provide a stable home and has chosen to live with a registered sex offender. *See In the Interest of R.R.*, 294 S.W.3d 213, 235 (Tex. App.—Fort Worth 2009, no pet.) (considering evidence of a parent's past convictions as being supportive of the trial court's best interest finding); *In the Interest of J.B.W.*, 99 S.W.3d 218, 229 (Tex. App.—Fort Worth 2003, pet. denied) (holding that incarceration is one factor courts can consider when determining the best interest of a child in a termination case).

The trial court also heard evidence that Mother did not comply with the provisions of her service plan which required her to complete individual counseling and nutrition classes, secure suitable housing, and obtain employment. *See In the Interest of M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (stating parent's noncompliance with service plan may affect fact-finder's consideration of child's best interest); *In the Interest of D.C.*, 128 S.W.3d 707, 717 (Tex. App.—Fort Worth 2004, no pet.) (explaining that parent's failure to complete service plan, provide a stable home, and remain employed support a finding that termination is in the child's best interest).

As to whether termination of Father's parental rights is in the children's best interest, the trial judge was presented with the following evidence: Father has not seen the children in months; he lives in Indiana and neglected to give the Department contact information when he moved; he was noncompliant with his service plan in that he did not complete individual counseling and nutrition classes; he left the children in Mother's care when he knew she was mentally unstable; and he verbally and emotionally abused Mother in front of the children.

Although the trial court heard evidence that the children's current placement is not an adoptive placement, the court also heard evidence that the children are adoptable. *See In the Interest of C.H.*, 89 S.W.3d at 28 (Lack of evidence regarding

definite plans for permanent placement and adoption cannot be the dispositive factor.). In this bench trial, the trial court as the fact-finder could judge the witnesses' credibility, observe the appearance and demeanor of the witnesses, and weigh the evidence as presented by the witnesses. The trial court could also have considered and weighed the lack of evidence of Mother's and Father's future plans, the stability or instability of each parent, and the demonstrated developmental improvements of the children since the time of removal.

Accordingly, we conclude that the Department established by clear and convincing evidence that termination of Father's and Mother's parental rights is in the children's best interest. We overrule Mother's third issue and Father's seventh issue.

The trial court's judgment is affirmed.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 13, 2014
Opinion Delivered August 21, 2014

Before McKeithen, C.J., Horton and Johnson, JJ.